IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOHN COOK, III, *et al.*        *
                                 *
         v.                      *     Case No. JFM-10-CV-0332
                                 *
RAYMOND HOWARD, *et al.*         *

******

# MEMORANDUM

John Cook, III, Patricia Cook, Linda Hammond, and Denise Brown ("Plaintiffs") bring this action against defendants and police officers Raymond Howard and Dwayne Green ("Defendants") under 42 U.S.C. §§ 1983, 1985, and 1988, and related state law claims, arising out of the death of John Cook IV.[1] Discovery has been completed, and Defendants now move for summary judgment as to the Amended Complaint. Plaintiffs oppose the motion. For the reasons stated below, Defendants' motion is granted.

## I.     Facts

On the afternoon of August 14, 2007, two Baltimore City Police Officers began chasing John G. Cook, IV on foot. Am. Compl. ¶ 32. During the course of the pursuit, several other police officers and a helicopter joined in the chase, which proceeded in the direction of North Fulton Avenue and West Franklin Street in Baltimore City. Am. Compl. ¶ 34. At some point during the chase, in his attempt to flee from the pursuing officers, Mr. Cook jumped over a fence that runs above a highway, Route 40. Am. Compl. ¶ 36. He was then hanging on to the fence with his hands with his body dangling over Route 40. Id.

---

[1] I previously granted a motion to dismiss the Amended Complaint as to the other defendants, including the Baltimore City Police Department, Police Commissioner Frederick H. Bealefeld, and Col. John Bevilaqua. (Memorandum & Order of August 19, 2010 [Dkt. Nos. 24&25]).

One eyewitness, Shamika Summers, testified that Mr. Cook went around a gap in the fence to get to the position from which he fell. Def. Mot. Ex. G, at 38, 39. Ms. Summers describes seeing a white police officer, wearing plain clothes and a red hat, hitting and shaking the fence, presumably intending to cause Mr. Cook to lose his grip on the fence. Def. Mot. Ex. G. at 11-12. According to Ms. Summers, only <u>one</u> African-American officer, in uniform, was present at the fence with other white officers when Mr. Cook fell. Def. Mot. Ex. G, at 47. Ms. Summers says that the "white cop" was shaking the fence and the African-American officer "was trying to like hold him or something, but" the white cop was shaking the fence and calling Mr. Cook names. Def. Mot. Ex. G, at 11-12. She testified that the African-American officer "was just trying to talk to [Mr. Cook], to make him come around . . . he didn't touch the fence at all." Def. Mot. Ex. G, at 109-110. Ms. Summers testified that she "didn't hear [the African-American officer] call [Mr. Cook] names and [she] didn't see [the African-American officer] pushing the fence." Def. Mot. Ex. G, at 85. In fact, Ms. Summers did not see the African-American officer do anything to cause Mr. Cook to fall. Def. Mot. Ex. G, at 86. She said that the African-American officer, whom she identified as Officer Dwayne Green, was crying after Mr. Cook fell, while the other officers were high-fiving each other and telling the bystanders to move. Def. Mot. Ex. G, at 15, 19-20. Ms. Summers testified that the African-American officer stood looking dazed and stunned as if "he couldn't believe he just probably witnessed what he witnessed." Def. Mot. Ex. G, at 84-85.

Another witness, Officer Haywood Bradley, is an African-American officer who was in uniform on the date of the incident. Def. Mot. Ex. B, at 36, 37. Officer Bradley testified that he heard a radio transmission of a foot pursuit and responded in a backup unit. Def. Mot. Ex. B, at 23. When he arrived at the scene he saw Officers Fried, Choi, and Stern at the fence, and they

2

told him that a guy was hanging from the wall who had a gun. Def. Mot. Ex. B, at 23, 24. Officer Bradley told Officer Stern that he was going to climb over the fence and asked him to help push it down so he could get all the way over. Def. Mot. Ex. B, at 35. Officer Bradley did not see what Officer Fried was doing at the time. Def. Mot. Ex. B, at 35. Officer Bradley and Officer Stern tried to pull down the fence so that Officer Bradley could get over the fence. Def. Mot. Ex. B, at 35, 36. Officer Bradley got over the fence, saw Mr. Cook, and told him, "hold on, I'm coming." Def. Mot. Ex. B, at 36. When Officer Bradley reached out to grab Mr. Cook, Mr. Cook fell. Def. Mot. Ex. B, at 37. Officer Bradley screamed for help, but saw a car on the highway run over Mr. Cook. Def. Mot. Ex. B, at 37. Officer Bradley did not see any officer do anything to cause Mr. Cook to fall at any time. Def. Mot. Ex. B, at 77-78, 81. Officer Bradley, who knows Officer Dwayne Green, specifically testified that "Dwayne wasn't there," referring to the "top scene" at the fence as opposed to the "bottom scene" on the highway. Def. Mot. Ex. B, at 77.

Defendant Dwayne Green testified that he was on vehicle patrol on the date of the incident. Def. Mot. Ex. A, at 10. He heard radio communication about the foot pursuit. Def. Mot. Ex. A, at 13. Upon hearing on the radio that the suspect went over the fence near the expressway, Officer Green drove down to be present on the highway in case the suspect began to run on the highway. Def. Mot. Ex. A, at 14. When he arrived on the highway, Officer Green saw Mr. Cook's body on the ground and positioned his car to shelter the body from oncoming traffic. Def. Mot. Ex. A, at 16. Officer Green then waited at the accident scene for the other officers to arrive. Def. Mot. Ex. A, at 16-17.

Defendant Raymond Howard testified that he was working in the accident investigation unit on the date of the incident, where he had worked since 1990. Def. Mot. Ex. E, at 16. He

was at the scene of another accident when he was called to this scene after the vehicle struck Mr. Cook.[2] Def. Mot. Ex. E, at 27-28. Officer Howard responded to the accident scene on Route 40 where Mr. Cook had been struck by the vehicle. Def. Mot. Ex. E, at 37. At that time, "[t]here was a body in the road and there was a car forward of the body." Def. Mot. Ex. E, at 44. Officer Howard was instructed by Colonel Bevilaqua not to interview witnesses to the accident, because that portion of the investigation would be handled by homicide. Def. Mot. Ex. E, at 20-21. Officer Howard was instructed to investigate the vehicle accident itself. Def. Mot. Ex. E, at 21. He prepared an accident investigation report, based on his conversation with one detective, Detective Purcell from homicide, and provided that report to his chain of command. Def. Mot. Ex. E, at 21-22, 45.

## II. Discussion

### A. Legal Standard for Summary Judgment

A motion for summary judgment is granted under Rule 56 of the Federal Rules of Civil Procedure if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 884 (1990). Summary judgment is precluded only when there are disputes over the facts that might affect the outcome of the proceedings under the applicable law. Factual disputes that are not relevant or not necessary will not be considered in a summary judgment motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the burden of showing that there is not evidence to support the non-moving party's case, and the moving party must only show an absence of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

---

[2] Another officer, Officer Joseph Rosado, corroborated in an affidavit that Officer Howard was at another unrelated accident scene when he was called to the traffic accident at issue. Def. Mot. Ex. F.

4

In response, the non-moving party must show that there is a genuine issue for trial. A court must decide whether there is a genuine issue for trial, "not . . . weigh the evidence and determine the truth of the matter." Anderson, 477 U.S. at 242-43.

### B. Section 1983 Claim Against Defendant Green

This case certainly presents continuing disputes of fact, including a dispute as to whether or not Officer Green was at the "top scene" at the fence. The issue, however, is not whether there are any disputes of fact, but whether there are disputes of material fact, and I find there are not. Even assuming that Officer Green participated in the foot pursuit of Mr. Cook and was the African-American officer Ms. Summers observed at the fence, there is no basis for a viable claim under § 1983.

Plaintiffs cite both the Fourth and Fourteenth Amendments in the Amended Complaint as the bases for their claims under 42 U.S.C. § 1983. To limit the concept of substantive due process, the Supreme Court has determined that where a particular Amendment "provides an explicit textual source of constitutional protection" against a particular sort of government behavior, that Amendment, "not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." Graham v. Connor, 490 U.S. 386, 395 (1989). Under that guidance, the initial analysis must be whether the Fourth Amendment governs the police conduct at issue here. It does not. Police pursuit while attempting to seize a person does not amount to a "seizure" within the meaning of the Fourth Amendment. See California v. Hodari D., 499 U.S. 621, 626 (1991). In County of Sacramento v. Lewis, the Supreme Court determined that the Fourth Amendment did not apply where police engaged in a high speed chase of a motorcycle and eventually crashed into the motorcycle's passenger, causing death. 523 U.S. 833 (1998). The Court reasoned that the police attempt to seize the motorcycle's occupants had

failed, and the mere pursuit did not constitute a seizure. Id. at 844. This case is analogous. Although the police were certainly attempting to effectuate a seizure of Mr. Cook, their attempt failed, as he got behind the fence without any physical police contact and eventually fell to his death.

As a result, this case is not governed by any specific amendment and must be analyzed under the substantive due process provisions of the Fourteenth Amendment. "The touchstone of due process is protection of the individual against arbitrary action of government." Wolff v. McDonnell, 418 U.S. 539, 558 (1974). Only the most egregious official conduct can be said to be "arbitrary in the constitutional sense." Collins v. Harker Heights, 503 U.S. 115, 129 (1992). "[T]he due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." Sacramento, 523 U.S. at 848. Instead, substantive due process violations occur only where the government engages in conduct that "shocks the conscience." Id. at 847.

In applying the conscience-shocking standard to the facts in Sacramento, the Supreme Court held that "high-speed chases with no intent to harm suspects physically or worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by an action under § 1983." Id. at 854. The officers' pursuit of Mr. Cook, then, which was not even a high-speed chase but a only a foot chase, does not give rise to a § 1983 claim, as it evidences no intent to cause him physical harm or to worsen his legal plight. All of the evidence supports the fact that Mr. Cook made the decision himself to go over or through the fence to attempt to escape the pursuing officers. Whether or not Officer Green was involved in that pursuit, then, is irrelevant as it does not establish a viable § 1983 claim.

In the context of this case, the only alleged action that might arguably give rise to a § 1983 claim would be the actions of the white officer, wearing a red hat, who Ms. Summers saw shaking the fence Mr. Cook was holding. It is undisputed, however, that the white officer was not Officer Green, who is African-American. The white officer was also not Officer Howard, because all of the evidence dictates the conclusion, which now appears to be accepted by Plaintiffs, that Officer Howard was not in fact present at the "top scene."[3] As a result, I need not determine whether that unknown white officer might be subject to a § 1983 claim. Ms. Summers testified explicitly that she did not see the African-American officer do anything to cause Mr. Cook to fall. Def. Mot. Ex. G, at 86. Even assuming, then, that Officer Green was the African-American officer at the top scene, which is a disputed issue, there would be no basis for § 1983 liability premised on his actions, which could not be characterized as shocking to the conscience.

The Amended Complaint makes no reference to a § 1983 conspiracy claim against Officer Green, and alleges no facts in support of such a claim. The only reference to any conspiracy in the Amended Complaint is the allegation that Defendant Howard and then-Defendant-Bevilaqua engaged in a conspiracy to cover up misconduct with false documentation. Am. Compl. ¶ 41. Instead, the Amended Complaint alleged that Defendants Howard and Green had personally took turns hitting the fence and caused Mr. Cook to fall. Am. Compl. ¶ 36. The current theory on which Plaintiffs seek to proceed against Officer Green is completely factually distinct. Plaintiffs now contend that Officer Green was a mere bystander observing and intentionally failing to intervene while other officers violated Mr. Cook's constitutional rights, and that he is therefore liable under a theory of § 1983 conspiracy. The liberal pleading standard

---

[3] In their Opposition to the Motion for Summary Judgment, Plaintiffs repeatedly refer to the fence-shaking officer as Officer Fried. In addition, Plaintiffs have withdrawn their survival and wrongful death claims against Officer Howard, in recognition of the fact that he was not present at the time of Mr. Cook's death.

for civil complaints under Federal Rule of Civil Procedure 8(a) "does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage. . . A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." Sensormatic Sec. Corp. v. Sensormatic Elec. Corp., 455 F.Supp. 2d 399, 436 (D. Md. 2006) (quoting Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314-15 (11th Cir. 2004)). It appears that the basic notice pleading standards were not met with respect to a § 1983 conspiracy claim against Officer Green.

Even had such a claim been properly pled, however, there is no genuine issue of material fact as to a § 1983 conspiracy claim against Officer Green. Plaintiffs cite Hafner v. Brown, 983 F.2d 570, 576-77 (4th Cir. 1992), for the proposition that Officer Green engaged in conspiratorial conduct because he witnessed the shaking of the fence and did nothing to prevent it. However, the testimony of Ms. Summers, the only witness to place Officer Green at the "top scene" at the fence, precludes such a finding. Ms. Summers specifically testified that the African-American officer, who she believed to be Officer Green, was trying affirmatively to talk Mr. Cook into coming back around the fence. Def. Mot. Ex. G, at 109-110. Although she testified that the African-American officer did not stop the white officer from shaking the fence, given the fact that the African-American officer was actively engaged in trying to coax Mr. Cook back around the fence, it cannot be said that he merely stood around and observed a violation of Mr. Cook's rights while failing to intervene. The efforts to convince Mr. Cook to return to a safe position constitute intervention in the dangerous situation that was presented.

Moreover, Ms. Summers's account of the African-American officer's reaction after Mr. Cook's fall further eliminates the possibility that the African-American officer could be found to have had a 'meeting of the minds' with his white colleagues. In Ms. Summers's account, the

8

white officers were high-fiving and celebrating while the African-American officer, like the bystanders, was crying and looking "dazed and stunned." Def. Mot. Ex. G, at 15, 19-20, 84-85. While the Hafner Court stated that "acquiescence can amount to a conspiracy agreement where, as here, one police officer watches an open breach of the law and does nothing to seek its prevention," Hafner, 983 F.2d at 578, that simply is not the factual scenario presented by Plaintiffs' single supporting witness in this case. As a result, there is no genuine issue of material fact as to Officer Green's participation in a § 1983 conspiracy.

### C. Section 1985 claim against Defendant Green

In order to make a Section 1985(3) claim, a plaintiff must show "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States." United Bhd. Of Carpenters & Joiners of Am. v. Scott, 463 U.S. 825, 828-29 (1983). "The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by law to all." Griffin v. Breckenridge, 403 U.S. 88, 102 (1971).

The § 1985(3) claim against Officer Green fails for essentially the same reason as the § 1983 conspiracy claim discussed above. There is simply insufficient evidence that Officer Green had any meeting of the minds with the white officers who allegedly engaged in what may have been a racially motivated attack on Mr. Cook. There is even less evidence that Officer Green, who himself is African-American, acted with any discriminatory animus towards Mr. Cook, who

9

was also African-American, or intended to deprive him of equal protection of the laws because he was African-American. To the contrary, Ms. Summers's testimony suggests that the African-American officer expressly did not participate in the race-based name calling and the celebratory conduct with the white officers after Mr. Cook's fall.

### D. Section 1983 and 1985 claims against Howard

Plaintiffs have no viable constitutional claims against Defendant Howard because they have not articulated any constitutional interest that was affected by his conduct. It is clear that Officer Howard did not violate any constitutional rights of Mr. Cook, who was already deceased at the time that Officer Howard arrived at the accident scene. The issue is whether he violated any constitutional rights of the Plaintiffs – Mr. Cook's parents and minor children.

In their court filings in this case, Plaintiffs have cited two possible constitutional interests. First, they have referred to a constitutional liberty interest in continued association and support of the defendant. The Fourth Circuit does not recognize that cause of action. See Shaw v. Stroud, 13 F.3d 791, 804-805 (4th Cir. 1994) ("Moreover, because the Supreme Court has never extended the constitutionally protected liberty interest incorporated by the Fourteenth Amendment due process clause to encompass deprivations resulting from governmental actions affecting the family only incidentally, we decline to sanction such a claim at the present time."). Plaintiffs rely instead on a Seventh Circuit case, Bell v. Milwaukee, 746 F.2d 1205 (7th Cir. 1984) for the proposition that family members have a constitutionally protected relationship with the decedent. However, Bell was expressly overruled in Russ v. Watts, 414 F.3d 783 (7th Cir. 2005). In holding that the parents of a young man shot and killed by police officers did not have a viable due process claim, the Russ Court noted that "[m]ost courts that have considered the issue have expressly declined to find a violation of the familial liberty interest where the state

action at issue was not aimed specifically at interfering with the relationship." Id. at 787 (citations omitted). In addition, "[t]he Supreme Court has recognized violations of the due process liberty interest in the parent-child relationship only where the state took action specifically aimed at interfering with that relationship." Id. at 788. There is no contention here that the cover-up actions could have been aimed at interfering with Mr. Cook's relationship with his family, as he was already deceased when the alleged cover-up occurred.

Second, Plaintiffs also make reference in various filings to a denial of access to courts. The Supreme Court has held that, in order to state a claim for a denial of access to courts, a plaintiff must plead with specificity the alleged underlying cause of action and the lost remedy. Christopher v. Harbury, 536 U.S. 403, 415-16 (2002) ("Like any other element of an access claim, the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant.") Because denial of access was not adequately pled, and because no other cognizable constitutional interest of the Plaintiffs was implicated by the alleged "cover-up" conspiracy, Plaintiffs' § 1983 claims against Officer Howard fail.

Finally, Plaintiffs' § 1985 claims also fail because the alleged "cover-up" conspiracy lacks the discriminatory animus essential to a claim under § 1985(3) or the second, and only arguably relevant, half of § 1985(2). The cover-up conspiracy, as alleged, was designed to protect BPD officers of different races and was not motivated by any racial animus or motivation against Plaintiffs.

### E. State law claims for Survival (Count III) and Wrongful death (Count IV) against Defendant Green[4]

Plaintiffs' state law claims are barred because Plaintiffs did not comply with the statutory notice requirements of the Local Government Tort Claims Act ("LGTCA"), Md. Code Ann., Cts. & Jud. Proc. Art. § 5-304(a). The LGTCA states, in relevant part, that "an action for unliquidated damages may not be brought against a local government or its employees unless the notice of the claim required by this section is given within 180 days after the injury." Id. The notice is required to be in writing and, in Baltimore City, must be provided to the City Solicitor. Id. at § 5-304(b) & (c). Because the statutory notice provision has the effect of a statute of limitations, compliance with the statute is an element of a cause of action that should be alleged in a complaint. See Carter v. Jess, 179 F.Supp.2d 534, 541 (D. Md. 2001) (citations omitted).

The injury in this case occurred on August 14, 2007, and the 180 day period has long since expired. Curiously, Plaintiffs reference the LGTCA in their complaint in noting that "Defendant BCPD is liable to pay any judgment entered against Individual Defendants Howard and Green." Am. Compl. ¶¶ 68, 74. However, Plaintiffs' failure to comply with the mandatory notice provisions of the LGTCA is fatal to their state law claims against Officer Green.

**Conclusion**

For the reasons set forth above, Defendants' Motion for Summary Judgment is granted.


Dated: <u>May 27, 2011</u>　　　　　　　　　　　　　　　_____ /S/_____
　　　　　　　　　　　　　　　　　　　　　　　　　　　J. Frederick Motz
　　　　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge

---

[4] In Plaintiffs' Opposition to the Motion for Summary Judgment, they withdraw their state law claims against Officer Howard.